Please be seated. Good afternoon everyone. This is the time and place set for argument in the case of Olson v. State of California, case number 21-55757. Before we begin, Judge Forrest and I would like to welcome and thank Judge England from the Eastern District of California who is with us once again to decide this case. We thank you for your perseverance, Judge England, and welcome back. Thank you, Judge Rawlinson. All right, counsel for appellants, please proceed. May it please the court, CNA Evangelist, on behalf of plaintiffs, I'd like to reserve five minutes for rebuttal. So, counsel, please be reminded that the time shown on the clock is your total time remaining. Thank you, Judge Rawlinson. This case is on plaintiff's complaint under Rule 12b-6. Which complaint? Which was the complaint that was dismissed, counsel? It was the second amended complaint. And plaintiff's 89-page complaint alleged in detail constitutional violations that depended on detailed facts. The district court rejected our allegations and made incorrect factual findings, concluded the opposite of what we alleged in some cases. And that was legal error. It violated the rules under 12b-6 and this court should reverse the district court's decision because AB-5 and its amendments irrationally and unconstitutionally roll back Dynamics' worker protections for similarly situated occupations while subjecting my clients to a higher standard. And the district court committed legal error in finding facts against us on a motion to dismiss. Counsel, before we go further, could you give us some examples from the record on where the district court made its own factual findings in contravention of your allegations? Yes, Your Honor. I'm glad you asked because I think the best example is at excerpts of record page 8. That's the the WAG app. And just to take a step back, we allege, and it's widely known as the Uber for Dogs. Uber for Dogs got an exemption under their referral agency exemption of AB-5, but Uber for People did not. And we alleged in detail how the two are the same. We went through facts, and there are many of them in the complaint. Paragraph 70, 73, 74, 77, 103, 104, and on. And in particular, paragraph 77, where we talked about exactly the fact that the workers who use Uber and the workers who use these other apps who got an exemption are really doing the same thing, and they're similarly situated with respect to control and everything. But the district court went on to say that, and just is hypothesizing and speculating that those service providers who use WAG likely exert more control over the service than my than the workers, my clients, the plaintiffs, Ms. Olson and Mr. Perez, and others who use Uber and Postmates. And that's contrary, directly contrary to what we allege. And, Your Honor, these are factual questions. The court has to ask what are the facts in order to determine whether they're similarly situated. The law doesn't tell us whether WAG and Uber are similarly situated. For that, we need facts. We allege detail facts. Again, 89 pages, it's quite a lot, but it goes on in detail at length. And that's why this case is exactly like Merrifield, where there was discovery, there was expert testimony, there was testimony from government officials, there was testimony from workers in the similar occupations. And there, the government's means undercut the ends, because actually what it did was in the exemption completely irrational. And the court looked at, this court looked at all of those facts to determine that. And we think here it's the same thing. We have all the ingredients of an equal protection violation. The means undermine the ends. AB 5, if its stated purpose is, which the government says, it's to replace Borrello with the dynamics test because allegedly Borrello didn't sufficiently protect workers and resulted in misclassification, well, if we take that on its face as true, then AB 5 harms millions of workers. Well, the problem is, and in fairness to the district court, and something that I have been struggling with in thinking about this case, is that the legal standard for an equal basis review is any conceivable reason. And there are cases, I mean, I went back and looked at the FCC case from the Supreme Court and the cases out of this court, and courts have wrestled with, is there any conceivable reason, even at the pleading stage? So separate and apart from what the legislature might advance as its reason, a court has the obligation to try to figure out if there's even another one that they didn't say. So how do we square that with the argument that you're making? I mean, I understand that you're wanting to put it in the box of, this is what they said their reason was, and we don't think that's legitimate because of how they're behaving. And I think that's a totally logical argument. I just don't know how to square that with a legal standard. Well, Your Honor, this court in Fowler did exactly what Your Honor has to do here. So Judge Forrest, what happened in Fowler was the same thing. The court looked at the articulated reasons and tried to come up with whatever reasons and looked at the factual allegations which have to be accepted as true, but said none of this makes any sense. These lines are completely arbitrary. And the fact that this is on a Rule 12b6 motion is critical because the court has to accept all of the allegations and the complaint is true. And if that is true, then looking at all of that, when we have details about being similarly situated to those who use WAG and TaskRabbit and Handy and all the other apps that got an exemption, there is really no rational distinction between the two if you credit our allegations as true, which we have to. And the fit between the means and the ends is what this court has to examine. It has to look at those lines and it has to say, does this distinction, which we say is arbitrary, but is it arbitrary or is there really a basis for it? And again, I'd like to just take a step back here and talk about the referral agency exemption because that is the key piece here that shows that this is just blatantly arbitrary. It's the most recent amendment to AB 5 and there the legislature doubled down on the irrationality and it really exacerbated AB 5's unequal treatment of my clients. So the referral agency exemption was built into AB 5 from the beginning, but it exempted those who run errands. And actually the district court in this case said in our preliminary injunction hearing, well, it's likely and possible that your clients would fit within the referral agency exemption and actually cited that as a reason against us. Well, immediately after that, the legislature and Assemblymember Lorena Gonzalez wasn't hiding it at all. Tightened up that referral agency exemption, exempted tons of others, including WAG, TaskRabbit, Handy, but made clear that it shall not apply to delivery, courier, and transportation services. Cutting us out of the exemption so that, and she said, that was the purpose. Like a pushback that you have to deal with there is it's well established that legislatures can choose to be incremental in their solving of a problem that they have identified. So they don't have to solve the whole problem at once. So why is it wrong for the legislature to say we're going to focus here because we think that this is an area where the problem is more significant or more prevalent or whatever? Your Honor, it's completely arbitrary. And what they did was drastically expand the referral agency exemption, but specifically carve out delivery, courier, and transportation. So in that distinction, that classification, what's the rational basis for that? I scratch my head. I cannot come up with anyone other than this arbitrary targeting. And again, very clearly Lorena Gonzalez said that it was done so that there was no way, quote, Uber would be able to say it meets the referral agency exemption. They came after us, Your Honor, like a heat-seeking missile. Counsel, is it your position that this statute and the proposition and AB 5 was directed to Uber specifically? Because that's what it sounds like you're saying is that there are carve-outs, and I'll get to that later on with the defendants or the appellees, but is that what you're saying right now? What we're saying, Judge England, is that this is an as-applied challenge. So we're not attacking the law facially as to everybody, but we are saying that we were unfairly targeted with the referral agency exemption that carved us out of that. Again, it's about what standard applies. So the legislature said, We think we need the ABC test because it's tougher. It prevents misclassification. But then they proceeded. When that applied to everyone in California under the Supreme Court's decision in Dynamics, they proceeded to then roll it back as to millions of people, including millions of direct sellers, including, we've alleged, categories where they said there was rampant misclassification. They actually rolled it back. So they undermined the ends that they stated. But you're not answering my question. Are you saying that this was a decision to go after Uber, if you will? I think that, yes, Your Honor, Lorena Gonzalez's comments made that clear. So, again, it didn't just cover my clients. That's true. This is a very big law. But the record, we've alleged the specific targeting, and it's just like Fowler in that respect. It was specific targeting of a disfavored party, which is impermissible. It's not a rational basis. And I want to get to this court's decision in American Society of Journalists v. Bonta, because I think that just proves my point. So there, that involved AB5 as well, and the plaintiffs were journalists. And there was originally an exception for journalism, but it had a 35-article limit. And so the journalists filed an equal protection challenge, arguing that that was arbitrary. Two days later, Assemblymember Gonzalez said, we're going to fix AB5, and we're sorry for all those who got swept up in it, and we're going to fix it. And then just months later, made clear that, you know, removed that cap, and in response to a challenge brought, an equal protection challenge brought by the journalists, fixed the statute to give them an exemption. So, again, that's why this court rejected the equal protection challenge there. They had a 15-page or so complaint that was thin, didn't have any of the factual allegations we have, certainly didn't involve the referral agency exemption. Completely different case worlds away from our facts, but, in fact, proves my point. So we filed our suit. Judge G. says we might fall within the referral agency exemption, such that Borrello would apply and not the ABC test. And the legislature turns around and says, oh, no, you don't. So, again, this is — I've never seen anything like this, Your Honor, other than maybe in the Fowler-Packin case. So, I mean, I think you, as a matter of pleading, you've got all those facts. You're right. You have a very detailed pleading, and you've got some pretty shocking statements that show that it looks like your client was sort of the focus of attention. What I'm still struggling with is, under the Supreme Court sort of any conceivable reason, standard, I guess I'm just — I'm legitimately curious what your position is on the law here. Do you think it's possible for a case to have evidence of, we'll say, a discriminative or a discriminatory application, but also have a conceivable, legitimate reason lingering about that maybe the legislature didn't focus on, and yet it would have to survive because there is this conceivable, legitimate reason present? Well, Your Honor, there is no conceivable, legitimate reason present here that's been identified, and that's the point. This is completely arbitrary. So, again, what we have here, we've examined. If we examine all of the — again, taking as true the facts, under 12b-6, and we examine all of the potential reasons, none of them hold up. And the district court's reasons — I mean, that's what's before this court here — the district court said, you know, just hypothesized that there's probably more control exerted by the workers who use WAG, again, contrary to our allegations. And I think the St. Joseph Abbey case from the Fifth Circuit is perfect there. It says courts can't hypothesize facts that are actually contrary to the actual facts under rational basis review. And this court in Fowler looked at the purported justifications for the classification, peeled them all away as they fell off one by one and said, nothing's left but arbitrariness and targeting, which is not a legitimate purpose. That's what we have here. So the district court did that, and then the district court said that WAG has not been subject to misclassification suits. That's demonstrably false. We cited the case. They have been sued for misclassification. Same exact thing, similarly situated. So that basis doesn't hold up. The other speculation and hypotheticals don't hold up. What we have here is a record that is replete with the sort of targeting and impermissible purpose. So I understand that that's your position, that there is no legitimate reason floating around out there. I want to come back to my question. If we disagreed with you and thought that there was one, but we also thought that there's evidence that you've pled that the legislature was going after specific companies, what do we do with that? Well, Your Honor, I think that if there is a legitimate basis that can be discerned from all of the allegations that have to be taken as true, there isn't one when I look at it. But if there's a legitimate basis there, then that's a different story. But I don't see one. Targeting is absolutely improper. And again, we have our due process challenge. We brought other challenges here, too. So I want to be clear that this is arbitrary and irrational and that our clients, again, Judge Gee's decision on the due process clause just assumed that owning your own business is the same as being an employee. But of course, owning the salon is not the same as being the hourly employee who is the stylist who works there. It's not the same thing. And we have detailed allegations. So again, the facts in the complaint have to be taken as true. And I don't think that this is at all like Beach. It's not like any of those other cases where we just accept some hypothetical reason because there's no contradiction to it. Here, we have a clear contradiction. And I see that my time is running out, but I just also want to point out, and I know it's in our brief, but again, this was blatant. The California Labor Federation sent around forms saying if you want an exemption, sign up now. So this was just, and again, that's what explains the arbitrariness. So that's why that's so important. It explains the arbitrariness and the fact that there's really no reason for the lines drawn. Counsel, you've used most of your time and you have not touched the preliminary injunction issue or the contracts clause claim. Could you briefly tell us what your position is on the preliminary injunction and what complaint was being considered at that point of the preliminary injunction hearing? I believe that was the First Amendment complaint, Your Honor, and it was a preliminary injunction hearing. We believe that because the district court's decision rested on an erroneous view of the law and the district court believed we didn't have a serious chance on the merits, that because we think we have stated a claim and because the district court's order on the motion to dismiss should be reversed, that the order on the preliminary injunction is wrong. And that's also before this Court. And again, we had detailed evidence. And the district court found the harm, found the harm and agreed with us on harm, but said that on the law, you're wrong. And that error, again, infected all of this. And that's why this Court should reverse. And on the contracts clause, again, Your Honor, despite Proposition 22's passage, the government is still maintaining a suit against us, and that goes to the preliminary injunction, goes to the contracts clause. But on the merits of the contract clause, what's your argument? Yes, Your Honor. And again, here, the way that the government has been attempting to enforce AB 5 would shred our contracts with people like Ms. Olson and Mr. Parris because they have contracts that allow them to run their own businesses. And this is not just a substantial impairment. It's a complete shredding of their contracts. And there is no solid reason for that. There's no substantial justification for it, as I've explained, for all of the same reasons. I have one quick question about that. My understanding of the contracts that you have is that they're not for a set duration. They're sort of at will, right? So the law changes, and you could change your contract in reaction to a change in the law. Is that correct? Well, the parties could amend their contracts, Your Honor. That's correct. But I mean, that's my question. You're not locked into something, even though the law has changed. You can adjust in reaction to the law. Well, yes, Your Honor. But those contracts are in place now. They are enforceable, and they are in place, and they have been substantially impaired. Thank you. I'll reserve my time.  Good afternoon, Your Honor. Jose Zaldanza-Peda, Deputy Attorney General for Defendant Attorney General Rob Bonta. May it please the Court, the Supreme Court has made it clear that unless heightened scrutiny applies, a statutory classification must be upheld against an equal protection challenge if there is any reasonably conceivable set of facts that could provide a rational basis for the justification. As Judge Forrest alluded to, it's a very differential standard, and the presumption is that legislation is constitutional, and the burden is on the challenging party, here the plaintiffs, to establish that there is no conceivable facts that could support that. Counsel, let me ask you this. Would you agree that the stated rationale was to correct the inadequacies of Borrello? Your Honor, that was one of the justifications. There's other justifications that the legislature set out in the legislative record. What are the other conceivable rationales for this legislation that takes into account all of the exemptions that were made? Well, under the legal standard, Your Honor, the court can look both at the stated justifications, but also any conceivable rational So I'm asking you, what are those other conceivable rationales? The legislature was concerned more and the attendant erosion of the middle class and wage theft, as well as concerns about certain businesses were not paying their fair share, and that there was this race to the bottom, where there was this competition to provide and basically cheat workers of the rights to which they are entitled. That's all the Borrello. Those are all the Borrello considerations. So besides those considerations, what are the other conceivable rationales for this legislation? It was not just Borrello, Your Honor. Respectfully, what the legislature looked at is the fact that after the California Supreme Court's decision in dynamics, it became clear that the Borrello standard was leading to problems and was not adequately accounting for misclassification problems. So the legislature talked about looking at the dynamics decision and what the California aspect of it, it had led to problems with how reliable it was for an employer and employee to know ahead of time what the classification was going to be, the extent to which it lent itself to misclassification because it could be manipulated. And therefore, the California Supreme Court in dynamics and the legislature following on the footsteps of the dynamics decision concluded that it made more sense to adopt the ABC test. And that's why the AB5 was to adopt the ABC test as a presumption for all classifications in the state unless specifically exempted. And there were substantial exemptions, two rounds as a matter of fact, correct? Yes, Your Honor. AB170 and AB2257, given the nature of this type of statute, the fact that it was meant to provide a default rule that applied to all hiring arrangements, it would make sense that the majority of the statute would be devoted to particular exemptions. And in that respect, this was not treading on particularly new ground. Even back to Borrello, the fact of the matter was that there were certain types of occupations that were deemed traditionally independent contractor. And a lot of what the exemptions in AB5, AB170, and AB2257 were geared towards were fine-tuning that both in terms of aligning it with the law before AB5 as well as looking at the realities and the other fine-tuning aspects of it that the legislature is particularly entrusted with doing in legislation of the type that we have at issue. But counsel, what is the conceivable reason for drawing a line between an Uber driver and somebody who provides services on task, Revit? Well, Your Honor, there's a couple of different aspects to that question. And I'll go back to what you pointed to, the fact that I believe it was one of your questions or your points in the question. The legislatures are allowed leeway in terms of addressing a problem one step at a time. And this also plays into the standard under rational basis, which is courts or anyone can look at what are conceivable reasons behind the justification. Sure. I mean, that's true, but there's got to be a line somewhere, right? Because would you be here arguing that it's perfectly appropriate for the California legislature to say that Lyft gets an exemption, but Uber doesn't? Your Honor, that would depend on the legislative reasons for it. Well, let's say it's these reasons. I could go ahead and answer that question, or I could go ahead and address the specific question that was dealt with earlier. No, because you answered that question. I want to hear the answer to that question, too. Your Honor, because that's a hypothetical situation, and we do not know the reasons why the legislature might undertake that type of justification, perhaps if there are different problems that are engendered by one application versus another, Lyft versus Uber, if there have been particular problems raised by the public. Wait, wait, what problems? You need to be specific. If you're going to draw a line between Uber and Lyft, for example, then I want to know what is it that you're using to draw that line? But, Your Honor, just to clarify, I'm not drawing the line between Lyft and Uber. I'm trying to respond about the potential— I'm sorry. I don't want you to get wound up around the axle around Lyft or Uber, but when you're making—when the legislature is making a distinction such as this, as Judge Forrest is talking about, what's the basis for it? Well, but again, Your Honor— What's the rational basis for making that distinction? Again, Your Honor, you're asking me whether I can conceive of reasons why the legislature might have a statute that we do not have presently and on which there is no factual record, which is why I cannot provide the reasons. But you're standing here arguing on behalf of the state of California right now for making these distinctions, the exemptions, the carve-outs, which are just—there's no rhyme or reason for when I look at them as to why they're doing it, and I want to know what's the reason for that. I disagree with that, Your Honor. There is a rhyme or reason, and if— What is it? What is it? And that's why, if I could go ahead and focus on a particular exemption, for example, on the WAG question, I can go ahead and address that particular question because that is what the district court addressed. Because there is no legislative classification in AB5 that says Lyft is to be treated different than Uber, I cannot provide what things the legislature considered. Only potential conceivable reasons of why the legislature might do that— There's no legislative history? There's no legislative history as to distinction— There's got to be. I mean, like I said, don't—I probably shouldn't have said Lyft versus Uber, but the whole concept that you're talking about, what is the basis for it? What's the rational basis for making these distinctions? The rational basis, Your Honor, is the fact that the legislature could look at a particular industry and decide that these industries are different in terms of the various considerations that the legislature was concerned about, whether it be misclassification, whether it be that there was a lot of litigation about it, whether there was a particular growth industry that was at issue. And that's why, for example, in this court's decision versus American Society of Journalists and Authors, which was a unanimous decision with Judge Forrest on the panel, the court pointed out the fact that a legislature can go ahead and address specific problems one at a time, that the legislature can look at many different reasons, and even if there are potentially or conceivably better-addressed ways to address, for example, misclassification in some other way or to greater precision, the Equal Protection Clause does not require that. But, counsel, that case didn't have the history we have in this case of pointed statements of animus and actions that sought to bar the Lyft and Uber even after the court made a preliminary finding that perhaps they could be under the errand. So that case is not persuasive in that vein because we don't have the same history as we have in this case. And then I wanted to ask you, that brings us to the issue about the pleading and whether or not the pleading regarding WAGs and the counsel's clients are substantially similar. And we are on a motion to dismiss. We have to accept the allegations as true. So why is it that the district court did not make impermissible fact findings when it rejected the substantial similarity allegations in the complaint? Two reasons, Your Honor. First of all, the precept that allegations had to be taken as true for purposes of a 12B6 motion applies to factual allegations, not to conclusions of law. Secondarily— So are you saying that the determination of whether two entities are substantially similar is an issue of law? Your Honor, what I'm saying is that— That's a yes or no question. Your Honor's question is whether the question of whether particular entities are similarly situated is a question of law. That is Your Honor's question? Is that a question of law in your view as opposed to a question of fact? That is a question of law, Your Honor. All right. So tell me the case that stands for the proposition that the determination of whether two entities are substantially similar for purposes of equal protection analysis is a question of law. Your Honor, the question, because we're talking here— Could you give me a case site to support your position? We have cited cases, and I can go ahead and look through our answering brief and address those specifically in terms of the similarly situated aspect of it. I just want to know, is that a question of fact or a question of law? It's a question of law, Your Honor. The allegations regarding the characteristics that a particular plaintiff deems him or herself to be similarly situated, those factual allegations are allegations of fact. But the determination of whether, in fact, looking at the overall statute, those particular entities are similarly situated are questions of law. On a motion to dismiss? On a motion to dismiss in the context of rational basis, which Judge Forrest alluded to, there's a little bit of a tension between the 12B6 standard and the fact that we're to look at any conceivable reasons. There's cases not in the circuit, but there's cases in other circuits, and we cited them in our brief, that make clear that because of the very lenient and highly deferential standard for legislative classifications on the rational basis, courts can look at conceivable reasons that could have motivated the particular justification. We can, but you haven't given us those. The legislature has stated reasons for it, and the district court looked at conceivable reasons. We've addressed plaintiffs, the particular exemptions that plaintiffs focus on. More broadly- I guess I come back to the question that I was trying to ask before of, so what is the conceivable argument for why Uber should be treated different than TaskRabbit and WAG? What is it? Well, and I thought it was really telling, Your Honor, that plaintiffs focus on that when you asked about the conclusions of a fact that the district court allegedly contradicted at Exeter's Record 8. And the district court talked about those distinctions. So, for example, plaintiffs focus on the similarities, and they talk about how supposedly this is the same type of service that is being provided. But the district court noted that there wasn't a history of misclassification concerns that these particular occupations have engendered. How is that possible when the relationship between the employees and the company, the workers and the company, is exactly the same? Based on the nature of their contract, it's the same type of relationship. So how is the misclassification issue any different from one to the other? The court can look at the case law. We cited a number of cases dealing with misclassification questions in the similar types of business models of plaintiffs, including plaintiff itself. We pointed to a decision of the Labor Commissioner that talked about misclassification concerns and finding that plaintiff had misclassified its employees. The district court cited other cases that dealt with the same issue. Now, on appeal, plaintiffs point to supposed similar problems of misclassification that have affected the WAG industry itself, but they cite one case that wasn't even brought to the district court's attention. But in any event— So I guess I'm trying to understand your answer. Okay. I think what you're saying is there's been a lot of litigation about Uber and other ride-share drivers and which box they fall in, employee or independent contractor. There hasn't been a lot of litigation about WAG people. Is that the answer? Not only litigation, Your Honor, but also finding some misclassification. Okay. So I guess I'm struggling with that a little bit still because as I think and I look at the Borrello test and I look at the ABC test and I think of the person who has the contract with Uber and the person who has the contract with WAG, and I cannot conceive in my mind how applying the factors of those two tests would result in a different answer for those two people because the relationship is the same. Well, Your Honor, it's two distinct questions whether applying the particular standard to one versus the other would lead to a different result in terms of independent contractor versus an employee. But really the question presented to the district court and presented here is whether the legislature could reasonably conclude that there were justifications and that there was a different reason why these occupation tests should apply differently to the two standards. In other words, to phrase it a little bit more broadly and as the Supreme Court made clear in the FCC versus speech communications case, the decisions of the legislature are not subject to court fact-finding and they can be based on rational speculation, unsupported by data or by empirical evidence. So specifically in this context, the legislature could have concluded that these particular aspects of the two occupations rendered them different for purposes of setting out the classification standard because they presented different concerns. I get that frame of argument, but I guess I think I and my colleagues continue to struggle with what is it? What is it that the legislature could say this is why these two things are different because we're all struggling with that? Well, besides, we've discussed the misclassification aspect, the fact that the misclassification has been deemed to be a problem in these types of industries versus other industries that plaintiffs- You keep saying misclassification. What's the misclassification? And I want to be specific on this because you've said it throughout your entire argument today that this is a misclassification case. What is the misclassification? I'm speaking about the misclassification concerns that the legislature was concerned with and we pointed to cases where there's been litigation against these types of industries like plaintiffs and including plaintiffs- What is these types of cases? I mean, let's back up a little bit more because we all know that there are people that work for, I hate to use the term, but these gig industries where this may be their second or third job. They're not employees, are they? And if that's the case, then how is it misclassified and what's the legislature doing? What's the thought process? What's the legislative history? The legislative history is the legislature looked at misclassification that was found by the Department of Labor study. The legislature looked at concerns that there were industries where there had been growing and that in those industries, there's been concerns about misclassification because these companies have a business model where they deem their workers to be independent contractors even though that's not the economic reality. Even though the workers want to be deemed as independent contractors? Your Honor, that might or may not be the case, but as multiple cases have pointed out, some individuals might not want the particular protections that are due to an employee, but others do. And the legislature is certainly within its rights and within its authority. Well, didn't Prop 22 take care of that? And that is tied up in litigation, Your Honor, because certain entities have claimed that it's invalid under the California Constitution and that issue has not been decided. But to the extent that Proposition 22 sets forth a different policy and it's deemed to be constitutional by the California Court of Appeal, that will obviously present a different question about what standards should apply. But putting that aside, and obviously we're not giving that short shrift because we understand that that is a very significant consideration. For purposes of this appeal, what we have here is a legislature concerns about misclassification, which multiple courts, including this court, have concluded these types of economic laws are perfectly within the purview of the legislature. And the legislature concluded that the best solution to this was to have a default ABC test with exemptions for particular industries. The exemptions are the problem, though, because you can have so many exemptions that the rule is swallowed. And I think we're very close to that here. That's the difficulty. If the aim was to put everybody in one category and then you take a number of people out, then you've gutted the reason for the legislation. I respectfully disagree, Your Honor. We are not talking about a statute that has a general rule and then 99% of the rest of it are exemptions and therefore it only applies to a small segment of the population. And the court doesn't have to take my word for it. This court already concluded in California Trucking Association in the context of a preemption challenge to AB5 that AB5 is a law of general application despite the fact that it has some exemptions, despite the fact that it has numerous exemptions and that some individuals or some entities claim that those exemptions swallow the rule. The court there concluded that AB5 applies to hundreds of different occupations. But this particular issue wasn't joined in that case. No, and I'm not saying that it was, Your Honor. I didn't mean to overstate that, but the court already concluded that AB5, looking at it in this court's decision in the American Society of Journalists and Authors, the court there rejected a similar equal protection challenge and concluded that these types of occupational distinctions are something that, again, is something that the legislature properly could have concluded and that I believe it also said something about the general application of that. So I have a procedural question. If we disagree with you and conclude that the plaintiffs have at least stated a claim, do we have to also reverse the district court's rejection of a preliminary injunction? No, Your Honor. We obviously would not agree to that. I see I'm a little bit over time. If I may, I just wanted to ask a question. Go ahead, please. Thank you, Your Honor. If the court concludes and we submit that the district court was correct in dismissing the complaint and there's no viable claim and we would note that plaintiffs had a chance to file multiple iterations, but if the court concludes that any of the claims are viable, I submit to the court that the appropriate remedy would be to remand for the district court to reconsider in light of whatever guidance this court can shed on the particular various claims. What about the preliminary injunction? Is it your view the preliminary injunction, what should we do with the preliminary injunction if we remand? Then I think all of that would be appropriate for the district court to reconsider in light of whatever guidance this court gives in terms of the dismissal order. In terms of the preliminary injunction, is it your view that there were no serious questions going to the merits? Yes, Your Honor. Even though we've been discussing this case for all of this time and had some really difficult conversations, you still think there were no serious questions going to the merits? Yes, Your Honor. I will grant that the fact that different minds could differ about whether there's a better way to address misclassification, about whether any of the exemptions could have been crafted better or different exemptions could have been given. There's definitely different minds could differ regarding that. But that is not the legal standard. The legal standard is that the courts have to defer to the legislature absent a very high standard that has to be met. Well, the standard is whether or not there are serious questions going to the merits of the case. They don't have to defer to the legislature on that part of it. That is correct, Your Honor. On that standard, I agree with you. But then that incorporates the standard under the various legal claims under equal protection, due process, contract to the bill of attender. And all of these claims have a very deferential standard in light of the legislation that is at issue. So therefore, it incorporates that standard. Those are questions. So back to the broader point of what the court should do, I think if the court concludes that there is at least one viable claim, that the district court should have an opportunity to reconsider that in light of whatever has changed factual circumstances going to the other discretionary factors under Wynter. Did the district court consider Prop 22 when it was making its ruling? The district court considered Prop 22 as part of its ruling on the motion to dismiss a second amendment complaint, but not on the preliminary injunction because it hadn't been passed at that point, Your Honor. All right. Thank you, counsel. Unless there are any questions further, I respectfully request that the court affirm the district court's decision. Thank you, counsel. Thank you. Buddle. Thank you, Your Honors. First, the district court's ruling on the preliminary injunction is before this court, and we believe that the legal errors infected that ruling. The district court found irreparable harm, but denied our preliminary injunction request because of its erroneous view of the merits. So, Judge Rawlinson, we think that the court should grant the injunction. And I'd like to go back to— Excuse me. Should reverse the district court's decision on the preliminary injunction. To go back to the key question here at issue, and, Judge Forrest, I didn't hear a single reason why it makes any sense whatsoever to exempt Uber for dogs and not Uber for people. Why it makes sense to exempt TaskRabbit, but not Postmates. It makes zero sense whatsoever. And, in fact, in our complaint, we've alleged all of those facts about the fact that these are exactly similarly situated. And, Judge Rawlinson, that is a factual question. It's not a legal one. That's why Merrifield was decided based on an extensive factual record. There was expert testimony on it. Experts don't testify to facts. They do testify to facts. Excuse me. To law. I misspoke. So are you citing Merrifield as your case for the proposition that substantial similarity is an issue of fact? Is that your case you cite for that proposition? Yes, Your Honor. And that's page 991 where it discusses the declaration from experts that showed that licensed pest controllers were similarly situated to the ones who were not required to get a license. It involved, you know, are mice similar to rats? That sort of thing. They had expert testimony, extensive factual record. The same is true in the Second Circuit's decision in who it came out. Very clearly said these are factual questions when you're looking at two comparators, whatever the inquiry. And it's obvious that these are factual questions because you have to ask the workers, what is your job like? And what is your job like? And we have alleged all of that in our complaint extensively. And the district court went outside our complaint and found facts that were contrary to what we alleged in the complaint. And on the, you know, what has happened in the court's issue, assuming for a minute that that's relevant as to which test we should apply to a group. WAG was sued in the Darcy v. WAG labs case. The government didn't argue that that was a reason before the district court. The district court went and made the determination that they haven't been subject to any lawsuits. Well, that's just not true. And also, we alleged in our complaint extensively, and it's paragraph 61, about how there had been numerous repeat findings that Uber had not misclassified. So actually, if you look at our complaint, we have a record of findings of no misclassification as to Uber. So that, again, we have to take that as true on 12b-6. That's just not true. And there is no rational basis for this. Again, Judge Rawlinson, it's the exceptions that swallow the rule, completely rolling it back, rolling it back in 22-57 in particular. This was not one step at a time. This was just, you know, a hole that you could drive a truck through in this law. And there is no conceivable reason. And if the standard was, you know, we're just going to imagine there must be a reason. And, you know, we're just going to assume that there must be a reason for every law. That's not the standard. Of course, Merrifield wouldn't have come out the way it was if that was the law. And the same with Fowler. It's a little confusing, though, because the cases talk about conceivable reason as opposed to a proffered reason, right? Even if a legislature could say, well, these were the reasons at the time, and then they come up with post hoc reasons. But the case is a conceivable reason. It's a conceivable reason that's rational, not arbitrary, and doesn't conflict the allegations in the complaint that must be taken as true. I think that's the answer to Your Honor's question. For instance, in Merrifield, at page 989, it said the record reveals at least one conceivable purpose. So there has to be some concrete conceivable purpose that somebody can articulate, it appears. Exactly, Your Honor. And then there they said, but this classification doesn't serve that. So, again, maybe the reason is WAG is different from Uber because the app is red and Uber is blue. Obviously, extreme example. But that would not be a basis for applying the Borrello test to one and the ABC test to another. It has to be a reason that we can trace back to a rational explanation for the law. Counsel, I'm on page 991 of Merrifield, and I want you to point me to the language on that page that says the determination of substantial similarity is an issue of fact. You cited that case for that proposition. So I'm asking you, where is the language on page 991 that says that? Yes. So the Ninth Circuit found, quote, those engaging in the non-pesticide control of less common pests are more likely to encounter prior pesticide use or are more likely to recommend to their clients that pesticides rather, to use pesticides rather than their services. That is a fact that was developed in discovery. Answer the question. The specific question I asked was what what case says that because generally, oftentimes will say something is a question of fact or a question of law, a point blank. And so you're asking us to extrapolate from that language that it's a question of that. But but I ask you what case says that specifically? Page 989. Also, again, it's just it's it's what the court is doing. And it's analysis that I understand that. That's not the question I ask you. The question I ask you is, is there a case that sets forth that this determination that we that has to be made by the court is a question of fact. And so I don't I can read this and make my own interpretation of what the court is doing. I'm asking you if there is a case that sets forth that point blank. The who case in the Second Circuit. But not in the Ninth Circuit. No, Your Honor, I didn't find a statement coming out and saying that in Merrifield, but it's just very clear that was on a motion. Well, it's not clear to me. So please don't say it's clear, because if it were clear, I wouldn't be asking. It is not. It doesn't come out and say it in that way. It's just two cross motions for summary judgment where there had been extensive discovery and evidence taken and expert testimony. And that's all discussed in pages 989 to 991. Any other questions? All right. Thank you, counsel. Thank you to both counsel for your helpful arguments. The case just argued is submitted for decision by the court. We are adjourned. Thank you. All rise. This court adjourned.
judges: RAWLINSON, FORREST, England